*319 OPINION OF THE COURT
James C. Harberson, Jr., J.
The plaintiff seeks $5,000 from the defendant, an automobile dealership with a service center, alleging a failure to properly determine what was wrong with her vehicle and correct the problem. The sole issue was whether the plaintiff had a cause of action when she took her vehicle in for service and the defendant’s service department failed to inform her of their ability to perform a diagnostic test that would have informed her of the reason she had been alerted by the “service engine soon” light several weeks earlier when she called the defendant about it and was given the appointment.
Facts
The plaintiff owns a 1997 Chevrolet 1500 pickup truck which she brought to the defendant, a Chevrolet dealership and service center, for service on October 6, 2003. At that appointment, a problem with the vehicle antilock brake system was repaired. Although the testimony differed on exactly when the plaintiff began experiencing further problems, she called at some point to make another appointment for service. She informed the dealership that the “service engine soon” light had come on, and was given an appointment for November 6, 2003. When she took her vehicle in for a second time, the invoice noted that the customer had stated the service engine had been on twice, but had not been on for a couple of weeks.
At that second appointment, a front end alignment was recommended and completed. Although the service engine light issue had been written on the repair order, it was crossed out. That information was written on the work order prepared for a signature to approve the expense of examining the vehicle at the scheduled appointment. When the plaintiff brought in her vehicle, she explained that the light had been off over the past two weeks and appeared to be “running fine.”
After the service manager told her the computer diagnostic scan would cost $79.10, he said that she spent 20 minutes deliberating and ultimately decided not to pay for the test. The service manager testified that because “the light had gone off and the vehicle was running fine . . . she declined to have it done so I crossed the scan off . . . the list of things to do” on the repair order sent to the mechanic. After the service performed at the second appointment, the plaintiff continued to have problems with her vehicle. Rather than return to the *320 dealership, she chose to continue driving her vehicle and later took it to other service locations.
Law
In New York State, a “legal duty independent of contractual obligations may be imposed by law as an incident to the parties’ relationship. Professionals, common carriers and bailees, for example, may be subject to tort liability for failure to exercise reasonable care, irrespective of their contractual duties.” (Sommer v Federal Signal Corp., 79 NY2d 540, 551 [1992].) As the court in Lunn v Silfies noted,
“the law of New York recognizes that a person who undertakes to make repairs or build or construct has a certain duty relating to quality of the work undertaken, even in the absence of contract provisions. Secondly, while the duty is certain, there exist vast differences in concept as to the legal basis or origin of the duty.” (106 Misc 2d 41, 42 [Sup Ct, Allegany County 1980].)
Where courts in other jurisdictions have purported to apply an implied warranty of fitness to cases involving the rendition of services, what has in actuality been imposed is merely
“a warranty that the performer would not act negligently, or a warranty of workmanlike performance imposing only the degree of care and skill that a reasonable prudent, skilled and qualified person would have exercised under the circumstances, or an implied warranty of competence and ability ordinarily possessed by those in the profession.” (Milau Assoc. v North Ave. Dev. Corp., 42 NY2d 482, 488 [1977] [internal quotation marks and citations omitted].)
Regardless of what the duty is called, it “imposes on the performer only the degree of care or skill that a reasonably prudent, skilled worker would have exercised under the circumstances. There is no requirement of perfection. The test is reasonableness in the terms of what the workman of average skill and intelligence would ordinarily do.” (Lunn, 106 Misc 2d at 44.) Although research has failed to disclose case law applying this specifically to automobile mechanics, the principles used in other service professions can be readily applied to the automobile repair industry.
In Milau Assoc., commercial tenants of a building sued the general contractor that built the warehouse and the subcontrac *321 tor that designed and installed the sprinkler system when a burst pipe caused substantial water damage. (42 NY2d at 484.) The suit was brought on the alternative theories of negligence and breach of implied warranty of fitness for a particular purpose. (Id.) The Court noted that if the party rendering services could be shown to have expressly bound itself to the accomplishment of a particular result, it would be enforceable. (Id. at 486.) Absent such circumstances, however, “reasonable care and competence owed generally by practitioners in the particular trade or profession defines the limits of an injured party’s justifiable demands.” (Id.) The Court further observed that “those who hire experts for the predominant purpose of rendering services, relying on their special skills, cannot expect infallibility. Reasonable expectations, not perfect results in the face of any and all contingencies, will be ensured under a traditional negligence standard of conduct.” (Id.) Finding no evidence that the pipes were unfit for their intended purpose or that the installation work had been performed negligently, the jury returned a verdict for the defendants that the Court upheld on appeal. (Id. at 489.)
In Mennella v Schork, the plaintiff owned a used truck powered by an old engine, and the defendant owned and operated an auto supply business. (49 Misc 2d 449, 450-452 [Suffolk Dist Ct 1966].) The plaintiff,needed replacement bearings for the engine, whose model number was not readily apparent. (Id. at 450.) The defendant, “[t]hrough the use of a micrometer, trade manuals and . . . years of experience,” determined the model number and ordered the replacement bearings. (Id.) However, because the engine had been rebuilt, the bearings turned out to be incorrect and caused some damage to the rebuilt engine. (Id.) The court stated that the “elements of negligence encompass some sort of duty breached by the defendant, whence liability might flow. The duty is one measured by what a reasonably prudent person would have done under the circumstances.” (Id. at 451.) Noting the care with which the defendant attempted to order the replacement bearings, the court found that he had acted reasonably under the circumstances, and thus there was no negligence. (Id. at 452.)
In a more recent Appellate Division, Fourth Department, case, S&W X-Ray of Rochester v Maselli Plumbing & Heating, a similar situation was presented. (210 AD2d 953, 953 [4th Dept 1994].) A customer had brought a negligence action against a plumbing and heating contractor for faulty repair of a fire sprinkler system. (Id.) The Court affirmed the jury verdict for the *322 plaintiff, noting that the defendant’s appeal “does not question whether defendant owed plaintiff a duty of reasonable care independent of its contractual obligations. The evidence supports the jury’s determination that defendant failed to perform the repair in accordance with accepted standards of the trade and thus violated that duty.” (Id. at 953 [internal citations omitted].)
Decision
In The New Division of Labor, the authors observed:
“Dennis LaGrand is a senior service technician at Medford Orbit, a new car dealership in Medford, Massachusetts. Like most auto technicians today, he relies heavily on computers. He uses computerized diagnostic equipment. He reads on-line factory service bulletins. He relies on in-car flash memory chips that record episodic events. The shop’s diagnostic computer uses rules-based software and it complements the rules-based diagnostics that make up most of shop repair manuals.” (Frank Levy and Richard J. Murnane, The New Division of Labor: How Computers Are Creating the Next Job Market, at 57 [Princeton Univ Press 2004].)
The defendant in this case is an automobile dealership that operates a service center for multiple automobile manufacturers. The shop foreman testified that he had been a mechanic for 20 years, during which time he received hundreds of hours of General Motors training as well as being trained “many times” on computer diagnostic equipment for modern cars. As such, the defendant would clearly be considered a professional vehicle repair establishment. Although there are often parts sold in order to complete the work, these are mainly incidental to the vehicle repair service itself. As the invoice from November 6th shows, the total parts charges were $25.99 while the total labor charges were $202.94. Therefore, this is primarily a service and falls outside of the Uniform Commercial Code and is governed by a negligence standard of care. (See Milau Assoc., 42 NY2d at 488 [noting the “predominantly service-oriented character of the transaction” and that “neither the code nor the common law” applied].)
In this case, the shop foreman for the defendant stated that when he received the repair order on the plaintiffs vehicle the “check engine light” note had been crossed off so he only checked out the other unrelated problems listed on it. He said *323 he never talked to the plaintiff because it was the service manager’s “job to sell . . . [to] see what they want to do.” He said that without the request to check out the “check engine light” written on the work order he did not have “the o.k. to have me look at [the] engine deal.” The shop foreman further explained that all modern cars have computers controlling various aspects of the engine’s operation as well as monitoring other areas of the car’s operation. He said when a “computer diagnostic” scan is done “all problems present. . . would show up” in the car’s systems monitored by the computer.
In addition to current information, the foreman said that if “we had done a scan on it, there would have been a history code in there . . . that would have told us what sub-section of the computer system might have ... an issue.” Notwithstanding the fact that the light had gone off two weeks before the appointment, the computer’s history code “would have told [me] what the code was three weeks before” when the light was on and the concerned plaintiff had called for the November 6th appointment.
The plaintiff was entitled to the “reasonable care and competence” of those in the automobile repair profession. Although the defendant would not be liable for perfectly diagnosing all problems, it was bound to exercise the standard of care that a mechanic of “average skill and intelligence” would ordinarily use in servicing the vehicle. Based upon the testimony of the shop foreman and the service manager, this court finds that the defendant breached this standard of care.
The computer has become an integral part of modern automobile engines as every new vehicle now comes equipped with one onboard. In the past, a road test or look under the hood might have been sufficient for a mechanic to reasonably diagnose any problems. However, mechanics today are increasingly reliant on the vehicle’s computer for diagnostic information as part of their overall assessment of the problem. In Mennella, the defendant had used a micrometer, trade manuals, and his years of experience when dealing with an engine from the 1950s. (49 Misc 2d at 450.) That was found sufficient by the court to show that he had acted reasonably according to the standards of his profession, and thus was not negligent. (Id. at 452.) However, at least part of that finding was based upon the fact that it was a very early engine model. (Id.) Had it been newer, the court suggested that the situation might have been different. (See id. [specifically noting the age of the engine].)
*324 As technology evolves, so too does the standard of care that must be shown by a professional in a trade. Like the micrometer used by the defendant in Mennella to allow him to make an informed professional decision, the computer today is a tool to allow a mechanic to make an informed professional diagnosis. Because the computer scan can reveal problems that would not otherwise be discoverable, modern automobile mechanics cannot provide the “reasonable care and competence owed generally by practitioners in the particular trade or profession” (Milan Assoc, at 486), without at least notifying a customer of the possibility of the diagnostic scan uncovering additional problems with their vehicle. Like an X ray sent for by a doctor to look beneath the surface for a possible broken bone, the computer diagnostic scan is necessary to fully determine what is wrong with a vehicle.
It is no longer possible for a mechanic to fully perform his job without the use of a computer diagnostic scan. However, in a situation where the diagnostic scan is not available to him without incurring an additional cost to the customer, it is enough that the customer be informed of what the diagnostic scan could uncover. If the customer is aware that a computer scan is necessary for full diagnosis and then chooses not to pay for the test, no negligence would follow if a problem with the vehicle was missed because reasonable care in the profession would have been used.
In this case, however, the plaintiff was not told that the scan could tell the mechanic why her “service engine” light had been lit several weeks before. By not giving her that information, she was unable to make an informed decision about whether or not to pay for the diagnostic scan. The service manager testified that she was unsure whether or not to pay for the diagnostic scan, and that she spent 20 minutes deliberating before deciding not to have the test run. This demonstrated that she was not informed of the importance of the diagnostic scan to the mechanic’s ability to fully diagnose any vehicle problems. A missed diagnosis at that point would be negligent, because the standard of care for the profession would not have been met.
In Milau Assoc., Mennella, and S&W X-Ray, a professional had used the tools of their trade as a part of a larger process, one which included investigation, selection, and installation stages. A failure to use reasonable care and competence at any stage of this process would result in defective performance of the job: a negligent effort in determining what was wrong, in *325 selecting the proper parts, or in doing the mechanical work would result in a breach of the duty owed to the customer. A fact-driven analysis in each case, the essential question was whether the defendant had breached a duty owed to the plaintiff as determined by the “accepted standards of the trade.” (S&W X-Ray at 953.)
In this case, the computer diagnostic test was an essential part of determining what was wrong with the vehicle in the investigation stage. The failure to inform the customer of the importance of the scan to that process prevented the use of the proper standard of care by the mechanic. This is because the mechanic testified that he would have used the diagnostic scan to retrieve the history code to determine why the “service engine soon” light had come on, if the customer had approved the expense of the scan. Requiring separate approval of the diagnostic scan would have been fine, had the customer been informed that it was required in order to ensure her problem was adequately diagnosed. The skipping of that step as a result of the service department’s policy was just as negligent as if the mechanic had chosen to skip it himself, unless the consumer was informed that the step was essential to the service work and then knowingly declined to approve it due to the added cost.
Specifically, the service manager failed to inform the plaintiff that the information concerning why her “service engine soon” light had been activated by the engine’s computer could have been answered by a diagnostic scan for the history code. She deliberated for 20 minutes with him about whether to spend $79.10 for a scan—in light of the fact the warning had gone off and the engine appeared to be functioning without any problems—without knowing that the scan could tell why the light had come on weeks earlier because he had not told her. This omission resulted in her decision not to spend money on the scan. Because this court finds it was his duty to inform her of that, the failure to do so was nonfeasance on the service manager’s part.
Although this court finds that the defendant’s conduct here amounted to negligence, there are still the issues raised by the plaintiff’s failure to return her vehicle for service when she continued having problems. By continuing to drive the vehicle and not providing the defendant with a chance to correct any defects that may have been discovered had the diagnostic scan been performed, she is no longer able to recover for any dam *326 ages. Although the defendant was negligent in not explaining that a diagnostic scan could reveal why her “service engine” light had been lit, that negligence was not a direct cause of any of the plaintiffs damages. Her continued driving of the vehicle, for several months and several thousand miles, relieved the defendant of liability by breaking the chain of causation, as any missed diagnosis by the defendant on November 6, 2003 cannot be said to be the proximate cause of any of the plaintiff s damages.